IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SHERRIE K. PRALL,            :
                             :
        Plaintiff            :
                             :
    v.                       :    CIVIL NO. 3:12-CV-01681
                             :
CAROLYN W. COLVIN, ACTING    :    (Judge Brann)
COMMISSIONER OF SOCIAL       :
SECURITY,                    :
                             :
        Defendant            :

## MEMORANDUM

## Introduction

Plaintiff Sherrie K. Prall has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Prall's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  Prall met the insured status requirements through at least September 30, 2011.  Tr. 22.[1]

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

Prall protectively filed her application for social security disability insurance benefits on May 14, 2009. Tr. 20. Prall claims that she became disabled on December 18, 2008. Tr. 164. Prall has been diagnosed with several impairments, including carpal tunnel syndrome, lumbar degenerative disc disease, occipital neuralgia, migraine headaches, diabetes, anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), depression, obstructive sleep apnea, and hypothyroidism. Tr. 22. On December 15, 2009, Prall's application was initially denied by the Bureau of Disability Determination. Tr. 73.

On December 28, 2009, Prall requested a hearing before an administrative law judge ("ALJ"). Tr. 78. The ALJ conducted a hearing on February 17, 2011, where Prall was represented by counsel. Tr. 35-68. On March 3, 2011, the ALJ issued a decision denying Prall's application. Tr. 20-32. On July 26, 2012, the Appeals Council declined to grant review. Tr. 1. Prall filed a complaint before this Court on August 22, 2012. Supporting and opposing briefs were submitted and this case became ripe for disposition on March 25, 2013, when Prall filed a reply brief.

Prall appeals the ALJ's determination on three grounds: (1) the ALJ failed to properly assess all of Prall's credibly established limitations, (2) the ALJ erred in reaching a physical residual functional capacity determination without the benefit of a medical opinion, and (3) the ALJ did not properly evaluate all of the opinion

evidence within the administrative record.  For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Prall is 44 years of age, has obtained a master's degree in special education, and is able to read, write, speak, and understand the English language.  Tr. 178, 187.  Prall's most recent past relevant work was as a learning support teacher, which is classified as skilled, light work.  Tr. 60.  Prall also had past relevant work as a preschool teacher, which is medium, semi-skilled work; as a sales clerk, which is light, semi-skilled work; as therapeutic support staff, which is light, semi-skilled work; and as a fast food worker, which is light, unskilled work.  Tr. 60-61.

### A.      Prall's Physical Impairments

On April 24, 2008, Prall was brought to the emergency room complaining of a headache.  Tr. 361-62.  A CT scan of Prall's head revealed no acute intracranial abnormalities, but did reveal "questionable cerebellar ectopia."  Tr. 360.  Prall subsequently sought treatment from her primary care provider, Laura Pennings, M.D. Tr. 354.  Despite continued headaches, an August 2008 MRI of the brain was unremarkable, as were December 2008 MRI and MRA scans.  Tr. 374, 382.

On December 29, 2008, Prall presented to Robert Reif, M.D. for examination.  Tr. 453.  Prall stated that, in addition to her headaches, she was having episodes of weakness and "unresponsiveness."  Id.  Dr. Reif observed one

such episode, and noted that it had "many non-physiologic features." Id. Dr. Reif

believed these episodes were related to stress, and were likely a result of a

combination of migraines and anxiety attacks. Id. At a January 2009 appointment,

Dr. Reif for the first time suspected that Prall's headaches were caused by occipital

neuralgia.[2] Id.

In 2009, Prall began experiencing back pain, and on April 30, 2009, MRI

scans were taken of Prall's cervical, thoracic, and lumbar spine regions. Tr. 297-

304. The MRI studies revealed minor issues in Prall's cervical and thoracic spine.

Tr. 302-03. The MRI of Prall's lumbar spine revealed mild grade I

spondylolisthesis,[3] bilateral facet arthropathy, and small central and biforaminal

disc protrusions at the L4-5 level. Tr. 303-04. This MRI also revealed mild disc

bulges at the L4-5 and L5-S1 levels. Id.

On May 11, 2009, Prall presented to Steven Triantafyllou, M.D., a spinal

specialist, for an opinion on her back pain. Tr. 467. Dr. Triantafyllou believed

that surgery was an option to treat Prall's spondylolisthesis. Tr. 469. On June 6,

_____

[2] "Occipital neuralgia is a distinct type of headache characterized by piercing, throbbing, or electric-shock-like chronic pain in the upper neck, back of the head, and behind the ears, usually on one side of the head. . . The pain is caused by irritation or injury to the nerves, which can be the result of trauma to the back of the head, pinching of the nerves by overly tight neck muscles, compression of the nerve as it leaves the spine due to osteoarthritis, or tumors or other types of lesions in the neck." National Institute of Neurological Disorders and Stroke, NINDS Occipital Neuralgia Information Page, *available at* http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.htm (last visited June 5, 2014).
[3] This condition occurs when "one vertebra slips forward and onto the vertebra below it." MayoClinic.com, Spinal Fusion: Why it's done, *available at* http://www.mayoclinic.org/tests-procedures/spinal-fusion/basics/why-its-done/prc-20020533 (last visited June 5, 2014).

2009, Prall successfully underwent lumbar decompression and fusion surgery, with Dr. Triantafyllou performing lumbar decompression at the L4-5 level with bilateral foraminotomies and discectomy.  Tr. 417, 421.  Bone dowels were also successfully applied in fusion surgery at the L4-5 level.  Id.  At a June 16, 2009 follow-up, Dr. Triantafyllou noted that Prall's spine was in good alignment, the instrumentation was intact, and her radicular symptoms were resolved.  Tr. 474.

On June 22, 2009, Prall returned to Dr. Reif for a follow-up on her headaches and episodes of unresponsiveness.  Tr. 435.  Prall reported that she was no longer experiencing severe headaches, and that her back pain was improved since her surgery.  Id.  Dr. Reif reassured Prall that her episodes of unresponsiveness were "a form of anxiety attack" and were not neurological in nature.  Id.  On October 2, 2009, Steven Ross, M.D., a neurological specialist, confirmed that Prall's headaches were likely resulting from a "non-neurological origin."  Tr. 573.  Prall had several appointments with Dr. Reif throughout late 2009 and 2010 where she complained of continuing headaches.  Tr. 800-810.[4]

On January 5, 2010, and again on January 26, 2010, Prall returned to Dr. Triantafyllou complaining of lumbar back pain.  Tr. 766-67.  At both appointments, Dr. Triantafyllou noted that Prall had a limited range of motion.  Id. A January 12, 2010 MRI revealed mild to moderate bilateral neural foraminal

---

[4] Prall had appointments with Dr. Reif on October 12, 2009, January 18, 2010, April 19, 2010, and August 9, 2010.  Tr. 800-810.

stenosis[5] at the L4-5 level, with moderate stenosis at the L5-S1 level.  Tr. 643.

However, the MRI also revealed normal spinal alignment and curvature.  Id.

The last medical appointment contained within the administrative record

occurred on November 8, 2010 when Prall presented to Dr. Reif.  Tr. 797.  At this

appointment, Dr. Reif noted that Prall's "headaches [were] under reasonable

control," and were overall improved.  Id.  Prall was not experiencing as many

headaches since she had begun taking a beta blocker, Atenolol.  Id.  Significantly,

Prall also stated that "her back pain ha[d] subsided."  Id.  Dr. Reif reported that

Prall "is happy with how things are going right now."  Id.

### B.     Prall's Mental Impairments

On March 11, 2008, Prall presented to Johar Shah, M.D., for an initial intake

session at WellSpan Behavioral Health.  Tr. 524.  At this appointment, Prall

reported low motivation and difficulty dealing with stressors; she also reported

feeling withdrawn and isolated.  Id.  Dr. Shah noted that Prall was depressed and

had a restricted affect.  Tr. 525.  Dr. Shah diagnosed Prall with depression not

otherwise specified and anxiety not otherwise specified; Prall was assigned a GAF

score of 50.[6]  Id.

---

[5] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine."  MayoClinic.com, Spinal Stenosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited June 5, 2014).

[6] A score of 50 is on the borderline between serious and moderate symptoms.  A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent

On June 11, 2008, Prall was examined by a licensed psychologist, Robert Gordon, M.Ed., at WellSpan Behavioral Health. Tr. 336-46. Mr. Gordon conducted a clinical psychological interview, as well as several objective tests. Tr. 336-37. Mr. Gordon observed intermittent distractibility and inattentiveness from Prall during the course of the interview. Tr. 336. Mr. Gordon diagnosed Prall with ADHD, generalized anxiety disorder, and adjustment disorder with depressed mood. Tr. 346. He assigned Prall a GAF score of 60. Id.

Prall did, however, obtain a "very low" score on the working memory index in an intelligence test; this led Mr. Gordon to conclude that Prall was severely impaired in performing complex tasks involving immediate auditory memory and sequencing skills. Tr. 340. Mr. Gordon observed that Prall had difficulty primarily with processing, sequencing, retaining, and interpreting lengthy and complex information that was verbally presented. Id.

Mr. Gordon believed that Prall "had difficult with sustained concentration." Tr. 344. Mr. Gordon further noted that the "inconsistency in her test performance is also reflective of variability in her level of attention and concentration." Id. Mr. Gordon believed Prall's anxiety exacerbated her attention deficits and

---

shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000). GAF scores between 51 and 60 indicate moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). Id.

distractibility, but believed that Prall would be capable of working, provided necessary accommodations were made.  Tr. 345.

Between June 2008 and July 2009, Prall had several appointments with Dr. Shah.  Tr. 515-22.[7]  In March and June of 2009, Dr. Shah noted that Prall's focus was "ok;" in July of 2009 her focus was "a little off."  Tr. 515-17.  At these appointments, Prall also reported that she had no anxiety and no panic attacks.  Id. In June of 2009, Dr. Shah noted that Cymbalta helped with Prall's mood and anxiety.  Tr. 516.  In July of 2009, Dr. Shah observed that Prall had good motivation, was sleeping well, and that her "mood ha[d] been good."  Tr. 515.  At an appointment with Dr. Pennings on August 20, 2009, Prall reported that she felt her depression was "controlled."  Tr. 672.

On September 22, 2009, Joseph Levenstein, Ph.D. evaluated Prall and completed a mental residual functional capacity assessment.  Tr. 538-48.  Dr. Levenstein found Prall to be alert, oriented, and cooperative with clear and well-paced speech.  Tr. 538, 542.  However, Dr. Levenstein also noted that Prall had a depressed and anxious mood, with a flat affect that later turned "tearful."  Id.  Dr. Levenstein noted that Prall shopped independently, paid her own bills, cooked, cleaned, did laundry, and independently maintained her personal hygiene, although she needed occasional reminders to take her medications.  Tr. 540-41.

_____

[7] These appointments occurred on June 25, 2008, July 21, 2008, August 25, 2008, January 15, 2009, March 16, 2009, June 2, 2009, and July 29, 2009.  Tr. 515-22.

Dr. Levenstein believed that Prall had a marked impairment in her ability to retrieve information from working memory.  Tr. 542.  He also believed that Prall's short-term memory was impaired.  Id.  Based on the recall tests and serial sevens test, Dr. Levenstein concluded that Prall's attention and concentration "were erratic."  Tr. 543.

Dr. Levenstein assigned Prall a GAF score of 53.  Tr. 545.  He opined that Prall had marked restrictions in her ability to understand, remember, and carry out detailed instructions, as well as moderate limitations in her ability to understand, remember, and carry out simple instructions.  Tr. 547.  Dr. Levenstein explained that Prall could understand, retain, and follow moderately complex instructions, although her ability to complete short, simple, repetitive tasks over time was compromised by her headaches.  Tr. 544.  Finally, Dr. Levenstein opined that Prall suffered from marked restrictions in her ability to interact appropriately with co-workers, supervisors, and the public.  Tr. 547.  He also believed Prall suffered from moderate restrictions in her ability to respond appropriately to changes in a routine work setting and extreme restrictions in responding appropriately to work pressures in a usual work setting.  Id.

On October 15, 2009, Richard Small, Ph.D., a state agency consultant, completed a mental residual functional capacity assessment based on Prall's medical records.  Tr. 549-52.  Dr. Small opined that Prall was moderately limited

in her ability to maintain attention and concentration for extended periods of time, and in her ability to set realistic goals or make plans independently of others.  Tr. 549-50.  Otherwise, Dr. Small did not believe Prall was limited in any way.  Id.

Dr. Small believed that Prall was capable of making simple decisions and carrying out very short and simple instructions.  Tr. 551.  He opined that Prall could sustain an ordinary routine without special supervision and that, despite the limitations resulting from her mental impairments, Prall was capable of "performing the basic mental demands of competitive work on a sustained basis." Id.  In reaching this conclusion, Dr. Small found Dr. Levenstein's opinion less than persuasive.  Id.  Dr. Small believed that Dr. Levenstein's opinion was "only a snapshot" of Prall's functioning, and contained internal inconsistencies, as well as inconsistencies with "the totality of the evidence in file."  Id.

On September 14, 2010, Mr. Gordon again examined Prall.  Tr. 855-859.  At that examination, Prall stated that she had been interviewed for several teachings positions, but was unable to answer questions during the interviews and was not offered any of the positions.  Tr. 857.  Mr. Gordon believed Prall was "unemployable" due to a combination of her migraines, back pain, anxiety, depression, and concentration issues.  Tr. 858.  He assigned a GAF score of 50-55. Tr. 859.

### C.    The Administrative Hearing

10

On February 17, 2011, Prall's administrative hearing was conducted.  Tr. 35-
68.  Prall first testified that, though her headaches became severe sometime in
2006, the headaches had recently come "under control" with the use of Atenolol.
Tr. 39, 59-60.  However, Prall testified that she still experienced "immense" back
pain, and still occasionally used a back brace.  Tr. 45-46.  Prall stated that her
doctor had limited her to lifting no more than fifty pounds.  Tr. 39.  She testified
that, due to her back pain, she only drove short distances, although she had recently
driven her son to Lock Haven to drop him off at college.  Tr. 46, 47.

Prall explained that, since her back issues had emerged, she no longer
attended NASCAR events or went bowling.  Tr. 49-50.   Prall also testified that she
needed to lie down twice a day for approximately two or three hours each time.
Tr. 54.  Prall stated that she could only look at a computer screen for thirty to sixty
minutes before she began having vision disturbances.  Id.  Prall testified that she
could only stand for a short time before her back began hurting.  Tr. 56.  She also
stated that her back hurts after sitting for too long; to resolve this issue, her doctor
advised that she place a pillow between her knees or behind her back.  Id.

After Prall testified, Cheryl Bustin, an impartial vocational expert, was
called to give testimony.  Tr. 60.  The ALJ asked Ms. Bustin to assume a

hypothetical individual who was able to work at a light exertional level[8] who could sit for six hours and stand or walk for six hours, but must be able to alternate between sitting and standing at will. Tr. 61. This individual was also limited to only occasional bending, kneeling, balancing, climbing stairs, and overhead reaching. Id. The individual could not be exposed to extreme temperatures. Id. Furthermore, the hypothetical individual was limited to understanding, remembering, and carrying out simple instructions, and exercising judgment in simple work related matters. Id. Finally, the ALJ limited this hypothetical individual to only occasional changes in her work routine. Id.

Under this hypothetical, Ms. Bustin testified that the individual would not be able to perform Prall's past relevant work. Tr. 61-62. However, the individual would be able to perform three jobs that exist in significant numbers in the national economy: a cashier II, a receptionist information clerk, or a security systems monitor. Tr. 62-63. Ms. Bustin reduced the number of available jobs for each position by fifty percent to account for the sit/stand option mandated by the ALJ.

---

[8] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

Id. Ms. Bustin testified that, in her experience as a vocational expert, individuals may bring pillows to work in order to accommodate back pain.  Tr. 67.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into

account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Commissioner of Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden

then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

### A. The ALJ's Mental Residual Functional Capacity Determination

Prall first argues that the ALJ erred in failing to incorporate credibly-established mental limitations in the residual functional capacity determination. Specifically, Prall argues the ALJ did not account for moderate limitations in concentration, persistence, or pace, and did not account for the fact that stress exacerbated certain of her symptoms.

At step two of the sequential evaluation process, the ALJ found that Prall had moderate difficulties maintaining concentration, persistence, or pace. Tr. 24. However, the ALJ elaborated that Prall only had difficulties with her memory and concentration; she did not have any difficulties with persistence or pace. Id. The ALJ further noted that this finding was "not a residual functional capacity assessment," and that the residual functional capacity assessment would more accurately reflect Prall's degree of limitation than what was reflected in the "broad categories" used at step two. Tr. 24-25.

In crafting a residual functional capacity determination, the ALJ relied heavily on the opinion of Dr. Small. Tr. 29. Dr. Small had concluded that, though Prall had moderate restrictions in maintaining concentration, persistence, or pace,

she was still capable of carrying out simple and short instructions.  Tr. 551.  The

ALJ also found that Prall's complaints of short-term memory problems and

concentration issues were credible.  Tr. 30.  The ALJ accommodated these issues

by limiting Prall to: understanding, remembering, and carrying out only simple

instructions; exercising only simple judgments; and only occasional changes to her

work routine.  Tr. 25.  Unlike <u>Ramirez</u>, here there was no medical opinion

suggesting that Prall had any deficiencies in her ability to maintain persistence or

pace.[9]  <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 554 (3d Cir. 2004).  Consequently, the

ALJ did not err in his accommodations for Prall's difficulties in concentration,

persistence, or pace.

Additionally, while the ALJ did not explicitly mandate a low-stress

environment to account for Prall's difficulties in handling stress, the ALJ

nonetheless adequately accommodated this limitation.  The limitations that the ALJ

imposed, such as limiting Prall to simple instructions, adequately eliminate any

stressful issues that Prall may encounter in the workplace.  <u>See</u>, <u>Menkes v. Astrue</u>,

262 F. App'x 410, 412 (3d Cir. 2008) ("performing a 'simple routine task'

typically involves low stress level work . . ."); <u>Zelenka v. Colvin</u>, Civ. A. 11-1442,

2013 WL 941823, at *5 (W.D. Pa. Mar. 11, 2013) ("the ALJ's hypothetical

---

[9]  Dr. Levenstein did opine that Prall had difficulties completing simple, repetitive tasks over
extended periods of time.  Tr. 544.  However, Dr. Levenstein explicitly stated that this problem
resulted only from Prall's headaches.  <u>Id.</u>  Since these headaches were controlled by the time of
the administrative hearing, this opinion was no longer relevant.  Tr. 39, 797.

question limiting plaintiff to simple, repetitive tasks sufficiently covered her need

to work in a low stress environment.").

### B.    The ALJ's Physical Residual Functional Capacity Determination

A residual functional capacity assessment must be based on a consideration

of all the evidence in the record, including the testimony of the claimant regarding

her activities of daily living, medical records, lay evidence and evidence of pain.

See Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121-22 (3d Cir 2000).

Rarely can a decision be made regarding a claimant's residual functional capacity

without an assessment from a physician regarding the functional abilities of the

claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician

suggested that the activity [the claimant] could perform was consistent with the

definition of light work set forth in the regulations, and therefore the ALJ's

conclusion that he could is not supported by substantial evidence.");  20 C.F.R. §

404.1545(a).  "Federal courts have repeatedly held that an ALJ cannot speculate as

to a Plaintiff's RFC; medical evidence speaking to a claimant's functional

capabilities that supports the ALJ's conclusion must be invoked."  Biller v. Acting

Comm'r of Soc. Sec., 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted).

This case is a rare occasion where the ALJ properly determined the

claimant's physical residual functional capacity without the benefit of a physician

assessment.  In this case, Prall alleged that her serious physical impairments

consisted of back pain and migraine headaches; both allegations were relatively

devoid of medical support.  At the administrative hearing, Prall testified that her

migraines were "under control" with her new medication.  Tr. 39.  This testimony

was consistent with Prall's medical records that indicated her headaches were well

controlled and less severe with the use of Atenolol.  Tr. 797.  Consequently, the

record did not establish any serious physical limitations as a result of Prall's

migraine headaches.

Prall testified that she still had serious back pain that limited her functioning;

however, her medical records did not support these allegations of pain.  While Prall

was initially diagnosed with significant lumbar spine issues such as

spondylolisthesis, later surgery corrected the most significant of these issues.  Tr.

303-04, 417.  Borderline mild to moderate spinal issues remained, but by late 2010

Prall informed Dr. Reif that her "back pain ha[d] subsided" and she was "happy

with how things [were] going . . ."  Tr. 797.  Additionally, the ALJ discounted

Prall's testimony regarding the symptoms associated with her back impairments.

Tr. 30.  The ALJ noted that, despite Prall's alleged difficulty sitting, she was able

to drive her son long distances to college, as well as cook multi-course meals,

clean, shop, and care for multiple individuals living in her home.  Id.

Despite the relative dearth of medical records supporting Prall's allegations

of pain, and despite the ALJ discounting much of Prall's testimony regarding

alleged symptoms, the ALJ did accommodate some of her complaints.  Prall

testified that she was limited to lifting "nothing over fifty pounds;" the ALJ limited

her to lifting nothing over twenty pounds.  Tr. 25.  This limitation was consistent

with Prall's most recent past-relevant work as a learning support teacher, which

was light work.  Tr. 60.

Significantly, no physician ever opined that Prall's physical limitations were

greater than the ALJ found them to be.  See, Burns v. Barnhart, 312 F.3d 113, 129

(3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical

opinion that supports [her] allegations that [her] pain and exertional limitations are

more severe than the ALJ found them to be.").

The ALJ considered all of Prall's medically determinable physical

impairments, as well as her alleged symptoms.  Given these facts, the ALJ did not

err in reaching a physical residual functional capacity determination without the

aid of a medical assessment that explicitly addressed Prall's physical limitations.

See, Talamantes v. Astrue, 370 Fed. Appx. 955, 958 (10th Cir. 2010) (finding

harmless error where the ALJ relied on a non-physician residual functional

capacity assessment, since no physician indicated that the claimant was more

restricted than the ALJ found, and the ALJ had properly considered the claimant's

symptoms and the extent to which the symptoms were consistent with the objective

medical evidence).

### C.    Evaluation of Opinion Evidence

Prall next argues that the ALJ did not properly evaluate all of the opinion evidence contained within the administrative record.  Prall challenges the ALJ's decision to give more weight to the opinion of Dr. Small than to Drs. Levenstein and Shah, or Mr. Gordon.  Additionally, Prall contends the ALJ erred in his treatment of the third-party statements given by Prall's mother.

### i.    Physician Opinions

The ALJ gave limited weight to the opinion of Dr. Levenstein, reasoning that, not only was his opinion based on a "snapshot" of Prall's functional ability, but the opinion was not consistent with the medical and non-medical evidence contained within the administrative record.  Tr. 28-29.  The ALJ also believed that Dr. Levenstein relied heavily on Prall's subjective complaints in reaching some conclusions; the ALJ found that these complaints were "not entirely supported by the totality of the evidence."  Tr. 29.

The ALJ also gave limited weight to Mr. Gordon's September 2010 assessment since it lacked evidentiary support for its conclusions.  Id. Additionally, the ALJ noted that Mr. Gordon's assessment did not offer an opinion as to Prall's limitations, but only addressed issues of Prall's ultimate disability.  Id. The ALJ noted that such an opinion is not entitled to any special significance, and is reserved exclusively for the Commissioner.  20 C.F.R. 404.1527 (d).

The ALJ also gave limited weight to Dr. Shah's initial assessment of Prall. Tr. 28.  The ALJ gave limited weight to this assessment because it was based only on Dr. Shah's initial evaluation of Prall, and may have relied too heavily on Prall's subjective complaints.  Id.  Considering Dr. Shah's later observations that Prall was anxiety-free for nearly four months, suffered from no panic attacks, and by July 2009 had a "good" mood and "good motivation," the ALJ's decision to give limited weight to Dr. Shah's initial assessment was supported by substantial evidence.  Tr. 515-17.

In contrast, the ALJ gave significant weight to the opinion of Dr. Small, a non-treating, non-examining state agency consultant. Tr. 29.  The ALJ found that this assessment was "supported by the medical records." Id.  An ALJ may reject the opinion of an examining or treating physician if a state agency consultant proffered a contradicting opinion, even if the consultant neither treated nor examined the claimant.  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Having been presented with differing evidence, some pointing to moderate to severe mental limitations preventing competitive work on a sustained basis, and some indicating that Prall would be able to meet the demands of competitive work on a sustained basis, the ALJ was required to credit some evidence over other evidence. The ALJ properly rejected the opinions of examining physicians and credited the evidence presented by the psychological consultant; this decision was

supported by substantial evidence.  <u>See</u>, <u>Chandler v. Comm'r of Soc. Sec.</u>, 667

F.3d 356, 362 (3d Cir. 2011) (holding that, where the ALJ properly considered the

opinion of the state agency physician, the ALJ's decision was supported by

substantial evidence).

    ii.    <u>Third Party Statements</u>

Finally, Prall argues that the ALJ improperly rejected the July 18, 2009

third-party statement of Prall's mother, Monica Marlowe and failed entirely to

address Ms. Marlowe's February 15, 2011 letter.  Ordinarily, failure to address a

third-party statement is reversible error.  <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>,

220 F.3d 112, 122 (3d Cir. 2000).  However, under the circumstances of this case,

any error here was harmless.

Ms. Marlowe's testimony neither buttressed Prall's testimony nor called into

question the ALJ's credibility analysis.  Ms. Marlowe's 2009 third-party statement

primarily addressed mental and physical issues that Prall experienced as a result of

her headaches.  Tr. 226-33.   However, Prall's headaches were later effectively

controlled by Atenolol, mitigating most of the symptoms described by Ms.

Marlowe.  Tr. 39, 797.  The only relevant limitations and symptoms addressed by

Ms. Marlowe's 2009 statement were Prall's memory and concentrations issues.

Tr. 231-32.  However, the ALJ found that Prall's allegations regarding memory

and concentration were credible, and accounted for these symptoms in the residual

functional capacity determination.  Tr. 30.  Thus, Ms. Marlowe's statement was not needed to support Prall's allegations regarding memory and concentration.

Ms. Marlowe's 2011 statement likewise neither buttressed Prall's testimony nor diminished the ALJ's credibility analysis.  Ms. Marlowe's 2011 statement again focused on the effects of Prall's headaches, despite the fact that these headaches had come under control by the time Ms. Marlowe wrote the 2011 statement.  Tr. 39, 260-63.  The statement also addressed back pain, which medical records documented as being under control, and memory and concentration problems, which the ALJ found credible and adequately accounted for.  Tr. 30, 39, 260-63, 797.  Consequently, the ALJ's error in considering these third-party statements was harmless.  See, e.g., Schrader v. Astrue, 4:11-CV-00902, 2012 WL 4504625, at *12 (M.D. Pa. Sept. 28, 2012), Boyd v. Astrue, 4:11–CV–00600, 2012 WL 1643337, at *10 (M.D. Pa. May 10, 2012); Butterfield v. Astrue, CIV.A. 06-0603, 2011 WL 1740121, at *6 (E.D. Pa. May 5, 2011) (collecting cases).

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner affirmed.

An appropriate Order will be entered.

BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: June 9, 2014